FILED

09/18/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 25, 2020

## DARRELL CARPENTER v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
No. 07-08772     John Wheeler Campbell, Judge
————————————————————

No. W2019-01248-CCA-R3-PC
————————————————————

In 2010, the Petitioner, Darrell Carpenter, was convicted of second degree murder and sentenced to serve twenty years in prison. The Petitioner was granted post-conviction relief in the form of a delayed appeal. After his conviction was affirmed, the Petitioner again sought post-conviction relief, asserting that he was denied the effective assistance of trial counsel and that the State withheld or destroyed exculpatory evidence. The post-conviction court held a hearing and denied the post-conviction claims, and the Petitioner appeals, listing in his reply brief twenty-five grounds for relief. The thrust of the Petitioner's claims is that a 911 chronology report allegedly contradicts the proof at trial, that trial counsel was deficient in not challenging the proof on this basis, and that the State failed in its duty to preserve or produce related evidence. After a thorough review of the record, we conclude that the Petitioner has not demonstrated that he received ineffective assistance of counsel or that his rights were otherwise violated, and we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Darrell Carpenter Clifton, Tennessee, *pro se*.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

### Trial

The Petitioner was convicted of shooting and killing the victim, Mr. Dedrick Campbell, in view of eyewitnesses after holding a brief conversation with the victim on Mr. David Young's front porch. On the Petitioner's delayed direct appeal, this court summarized the evidence introduced at trial as follows:

At trial, David Young testified that the victim, Dedrick Campbell, knocked on the front door of his home … in Memphis on July 10, 2007, in the late afternoon. The victim wanted to borrow Mr. Young's cell phone. Mr. Young complied, handing his phone to the victim. The victim took the phone to the front porch of the home. He was seen talking on the phone on the front porch of the home by both Mr. Young and Steven Moore.

Mr. Moore was walking down the street on the afternoon of July 10 around the same time the victim was on Mr. Young's front porch talking on Mr. Young's cell phone. He testified at trial that he witnessed [the Petitioner] and another man walk up to the victim…. Mr. Moore was far enough away that he could not hear what the men discussed during a conversation that lasted approximately ten minutes. Mr. Young went onto the porch at some point during the conversation between the three men to see if the victim still had his cell phone. He observed [the Petitioner] talking to the victim. Mr. Young went back into the house and sat on the couch.

At the conclusion of the conversation, Mr. Moore observed [the Petitioner] turn as if to walk away, then turn back toward the victim and fire a shot. The shot hit the cell phone that the victim was holding in his hand. The victim walked toward [the Petitioner and] was shot twice in the chest. At that point, the victim turned to run toward the front door of the home. The victim was shot several times in the back. He died as a result of multiple gunshot wounds.

Mr. Young heard the gunshots from inside the home. He looked out the window and saw the victim running toward the house then saw the victim change directions and run. Mr. Young went to his bedroom to call 911. From this vantage point, he saw [the Petitioner] running down the

street. Mr. Young stated that he did not see anything in [the Petitioner]'s hands while he was running.

Mr. Young exited his home after he got off the phone with 911. The police were already on the scene. Mr. Young saw the victim lying on the sidewalk and his cell phone on the steps. The phone had a bullet hole through it.

The first officer on the scene, Richard Rouse of the Memphis Police Department, heard shots fired in the area of Lewis and Brown. He saw someone run across the street but he was, at that time, unaware of the situation. As he got closer to the scene, he saw the victim lying partially on the curb and several men nearby. Officer Rouse asked these men to identify the perpetrator. He was told that the shooter was on the run. Officer Rouse ran in the direction of the shooter but was unable to locate a suspect.

*State v. Darrell Carpenter*, No. W2012-00947-CCA-DAC-CD, 2013 WL 5739753, at *1-2 (Tenn. Crim. App. Oct. 17, 2013), *no perm. app. filed*.

The testimony at trial established that Officer Rouse was actually responding to an unrelated call down the street when he heard shots fired from about six houses away. Mr. Moore, the victim's cousin, testified that the Petitioner's companion told him to run shortly after the shots were fired because the police were "up the street."

Officer Hope Smith, a crime scene unit officer with the Memphis Police Department, testified at trial that she drew the crime scene sketch which identified the two items on the scene, a visor and a cell phone. She testified that the victim had been moved and the scene secured when she arrived. She collected a cell phone with a bullet hole in the flip top. Officer Smith testified that she took photographs of the crime scene, and three photographs were entered as a collective trial exhibit. Asked to use a pointer to point out to the jury on the photographs where the cell phone was found, Ms. Smith stated, "Cell phone is right there by the placard[;] this is number 1." The prosecutor, referring to a photograph, asked, "And is this the cell phone we just showed to the jury?" Officer Smith responded that it was.

The medical examiner testified that the victim suffered four bullet wounds in the back and one in the left front of his chest. All five projectiles were recovered from the victim. Bullets pierced the victim's heart, lungs, liver, pancreas, and small intestines. The victim died of multiple gunshot wounds. A toxicology report indicated the victim had consumed alcohol, marijuana, and cocaine.

The jury convicted the Petitioner of second degree murder, and he received a twenty-year sentence to be served at one hundred percent. The Petitioner's trial counsel withdrew from representation after sentencing. *Id.* at *2. He hired a new attorney ("appellate counsel"), who filed a motion for a new trial that was not timely. *Id.* The trial court nevertheless held a hearing, and it denied the motion. *Id.* Appellate counsel then failed to file a notice of appeal. *Id.*

## Post-Conviction

The Petitioner filed a timely post-conviction petition, asserting numerous instances of ineffective assistance of counsel, including that appellate counsel failed to perfect an appeal. *Id.* at *2. The record contains several references to an extensive hearing held by the post-conviction court, during which trial counsel and other witnesses testified to matters pertinent to the claims of ineffective assistance of trial counsel. After the hearing, the post-conviction court granted a delayed appeal based on appellate counsel's failure to seek appellate review, and this court concluded that, because the late-filed motion for a new trial was a nullity, the only issue before the court on appeal was sufficiency of the evidence. *Id.* at *2-3. This court concluded that the evidence was sufficient to support the verdict. *Id.* at *4.

The Petitioner timely pursued further post-conviction relief. The record demonstrates that the Petitioner cycled through several attorneys and that he ultimately represented himself with the assistance of "elbow counsel" during the presentation of post-conviction proof. The Petitioner's post-conviction theory centered around a 911 chronology that showed emergency calls regarding the shooting. The petition delineated numerous claims centering around the fact that the actual 911 recordings were no longer available because they had been erased. The Petitioner also alleged that the chronology demonstrated that Mr. Young did not, as he had testified at trial, call 911. The Petitioner further contended that the 911 chronology demonstrated that the victim, after the shooting, called 911 from a landline inside Mr. Young's house. The Petitioner concluded that the cell phone with the bullet hole in it was not the telephone being used by the victim and that this evidence, and testimony surrounding it, was fabricated and intentionally presented as false evidence by the prosecution. The post-conviction court held three hearings addressing the Petitioner's post-conviction claims.

Ms. Ruth Murray, the custodian of records for Central Records, testified that audio recordings of 911 calls are routinely kept for eighteen months and that a printed chronology of the events is routinely kept for eight years. She confirmed that an attorney would be able to obtain the audio recordings if they were sought in the relevant time period.

- 4 -

She identified a chronology of an emergency event occurring July 10, 2007, during which a shooting was reported to 911. The initial call came in at 6:14 p.m., reporting that the shooting took place at Mr. Young's address and summarizing the event as "DEDRICK SHOT." The chronology lists the telephone number calling and contains a notation, "Name= MONDIE, PHYLLIS." This information is later again listed by the same operator, number 11078, in an "EVENT UPDATED" entry which assigns a primary "unit" and primary "member" to the event. Other entries made by this operator reflect additional information obtained, such as the suspect's clothing description. Operator number 10675 created numerous entries showing a dispatch of various numbered "units" and "employees" to the scene.

The event chronology contains an entry from operator 4458 at 6:15 p.m., describing "ANOTHER CALL FROM 650 2887...ADV SAME INFO....UNK RESP @ 1815." A later cross-referenced event by operator number 10675 gives an "ALT" 901-area-code telephone number with the note, "COMP ADV SOMEONE I[S] TREATENING HIM AND HUNG UP, VM ON CB."

Ms. Murray confirmed that the chronology reflected that the caller's name was Phyllis Mondie. She testified that callers would sometimes, but not always, provide their names and that operators did not attempt to verify callers' names but would write down whatever name was given. She agreed that the person who called would have given the information "Dedrick shot." Ms. Murray agreed that there was another call. After the Petitioner read the cross-referenced event as "complainant advised someone threatened him and hung up, victim on callback," Ms. Murray echoed his reading as "victim on callback."

Ms. Phyllis Mondie testified that she lived at the address where the victim was shot and that she was at home during the homicide. Her home had one landline, and the telephone was not cordless. She testified that she did not call 911 after the shooting but that her boyfriend did, and she did not know why the chronology listed her name. She did not recall the victim making a call from her home telephone. She did not see the victim's body after the shooting.

Mr. Young also lived at the address where the victim was shot. He recalled that he had allowed the victim to use his cell phone and that he was sitting on a couch where he could see the victim using the telephone on the porch through the open front door. At one point, the victim moved, and Mr. Young went onto the porch to retrieve his telephone, thinking the call was complete. He then saw the victim talking with the Petitioner and another man. Mr. Young returned to the house and began to watch television when he heard shots. He saw the victim try to run up the steps but turn and fall back down the steps and saw the Petitioner run away. Mr. Young testified consistently

with his trial testimony that he called 911 to report the shooting. When asked why the chronology would reflect Ms. Mondie as the caller, Mr. Young explained that the telephone was "in her name." He confirmed that he was the person who called 911, and he confirmed that he told the operator that "Dedrick was shot." Mr. Young denied that the victim had ever come into the house to use the telephone, noting that the telephone was in the bedroom and that he would not have permitted the victim to come into the bedroom. Mr. Young reiterated that the victim had borrowed his cell phone prior to the shooting, that Mr. Young was the 911 caller, and that the victim never came in the house. Mr. Young recalled crime scene investigators taking photographs of the scene.

Assistant District Attorney General Doug Carriker assisted the lead prosecutor during the Petitioner's trial. He stated he was only assigned to the case the week before trial and that he did not investigate or have any knowledge about the 911 tapes. He testified that the chronology appeared to show two calls from two separate numbers placed within a minute of the shooting. General Carriker agreed that he had an ethical duty to correct any testimony he knew to be untrue. He testified that nothing in Mr. Young's testimony appeared incorrect or appeared to be inconsistent with prior statements by Mr. Young. In General Carriker's opinion, the chronology would not have helped the defense because two eyewitnesses could identify the Petitioner as the shooter. General Carriker did not recall if a photograph of the cell phone was introduced at trial, but he stated it would be unusual not to introduce a photograph. He recalled that the cell phone itself, which had a bullet hole in the middle of the screen, was made an exhibit.

Trial counsel testified that she "would assume" that she obtained the 911 chronology through discovery. She did not recall if she introduced the chronology at trial, noting that not all discovery would be admissible or introduced at trial. Trial counsel did not think that the custodian of the 911 records would have possessed information beneficial to the defense. Trial counsel testified that she did not object to the introduction of the cell phone or the crime scene sketch because she did not see a basis to object. She stated that she thoroughly investigated the case and objected to evidence she thought should be excluded.

The post-conviction court denied relief. The court found that the Petitioner's first attorney had testified that he could not recall if he obtained the 911 audio tapes.[1] The Petitioner's first attorney was asked to review his case file and to prepare to testify regarding the tapes later, but he was never recalled. The post-conviction court also found that the Petitioner's investigator interviewed witnesses and attempted to get the 911

---

[1] We presume that the post-conviction court's summary of the testimony of the Petitioner's first attorney, the Petitioner's investigator, and some parts of trial counsel's testimony is taken from the hearing which resulted in the grant of the delayed appeal.

tapes, which had by that time been destroyed. The investigator testified that she obtained the chronology and shared the chronology with the Petitioner. The post-conviction court also summarized trial counsel's testimony that she shared the chronology with the Petitioner and was aware of the identity of the 911 callers. She testified that, although the evidence established that a cell phone was shot from the victim's hand, there was no allegation that the victim had called 911 or was calling 911 when he was shot. The court noted that Ms. Murray could only testify to the data printed in the chronology.

The post-conviction court found that trial counsel could not have obtained the 911 tapes because they had been erased and that the Petitioner had failed to present any evidence regarding what steps his first attorney had taken to procure the tapes. The court also found that trial counsel obtained discovery and performed reasonable investigation and that the Petitioner had not presented any evidence which trial counsel failed to uncover. Accordingly, the post-conviction court concluded that the Petitioner did not receive ineffective assistance of counsel. The post-conviction court also found that the Petitioner had not demonstrated that the State withheld exculpatory evidence. The petition for post-conviction relief was denied.

## ANALYSIS

### I. The Record and Issues on Appeal

We begin by observing that the appellate record in this case leaves something to be desired in terms of clarity and content. For example, there are documents that, while clearly provided as part of the clerk's records, lack a file-stamp date or only exhibit a handwritten date without a stamp or signature.

We note further that the post-conviction court's ruling appears to incorporate testimony from the initial post-conviction hearing during which the Petitioner was granted relief in the form of a delayed appeal. The transcript of this hearing is not part of the appellate record in this case. Neither was it part of the record of the delayed appeal decided in 2013, which contained transcripts of the trial, of the sentencing hearing, and of the hearing on the motion for a new trial.

We observe that the appellant has the duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). In the absence of a transcript, we presume that the trial court's judgments were correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Accordingly, we accept the post-conviction court's factual findings related to the evidence from the initial hearing which has been omitted from the record on appeal.

We observe that it is also unclear whether the Petitioner's numerous *pro se* filings were made while he was represented by counsel or after he was permitted to proceed pro se with an attorney acting as "elbow counsel." The Petitioner's initial *pro se* petition raised appellate counsel's failure to file an appeal as well as ineffective assistance of trial counsel. After an initial hearing, the Petitioner was permitted to proceed with a delayed appeal, and the post-conviction court entered an order dismissing the remaining post-conviction claims. A document labeled "Amended and supplemental petition for post conviction relief," which did not allege any cognizable post-conviction claims, was filed by a new attorney on the Petitioner's behalf after this court denied the delayed appeal. The Petitioner then filed a *pro se* amended petition raising cognizable post-conviction claims. After a competency evaluation of the Petitioner, the attorney who had represented the Petitioner on his delayed appeal was permitted to withdraw, and post-conviction counsel was appointed to represent the Petitioner. The exact dates and scope of representation by these three attorneys is unclear from the record. After the appointment of post-conviction counsel, the Petitioner filed another *pro se* amendment to the petition and a motion to compel discovery. The order addressing the discovery motion noted that the Petitioner had refused the assistance of counsel. A subsequent order clarified that the Petitioner desired to proceed *pro se* and that the attorney who had been appointed to represent him would assist him with obtaining documents for the post-conviction hearing. We conclude that it is unclear which documents constitute the written petition that serves as the basis for the Petitioner's claims.

"As a general rule, this court will not address post-conviction issues that were not raised in the petition or addressed in the trial court." *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996) (citing *State v. Smith*, 814 S.W.2d 45, 49 (Tenn. 1991)). However, this court has frequently addressed issues on post-conviction appeal which were absent from the post-conviction petition so long as they were presented to the post-conviction court. *See Kenneth Hayes v. State*, No. W2016-01522-CCA-R3-PC, 2017 WL 3106918, at *8 (Tenn. Crim. App. July 21, 2017), *no perm. app. filed* (citing cases); *Timothy Lamont Thompson v. State*, No. M2015-00846-CCA-R3-PC, 2016 WL 496996, at *4 n.1 (Tenn. Crim. App. Feb. 9, 2016); *James Randall Roskam v. State*, No. M2014-00599-CCA-R3-PC, 2015 WL 3398394, at *6-7 (Tenn. Crim. App. May 27, 2015) (addressing an issue not raised until the post-conviction hearing); *Kevin Allen Gentry v. State*, No. E2013-00791-CCA-R3-PC, 2014 WL 1883701, at *11 (Tenn. Crim. App. May 12, 2014); *Shawn Simmons v. State*, No. M2012-00987-CCA-R3-PC, 2013 WL 1225857, at *5 n.3 (Tenn. Crim. App. Mar. 27, 2013). Accordingly, we will review the issues that have been raised on appeal and also raised in the written filings below or addressed by the post-conviction court.

The Petitioner's reply brief lists twenty-five issues he wishes to address on appeal. Many of these issues are duplicative of one another, and some issues are waived for

failure to raise them below. *See* T.C.A. § 40-30-106(g). The Petitioner's appellate claims center broadly around the cell phone with the bullet hole in it which was introduced at trial, the fact that the crime scene photographs allegedly did not include a photograph of the cell phone found at the scene, and the allegation that the 911 chronology contradicts Mr. Young's testimony. We note that the written petitions, on the other hand, broadly focus on the failure to obtain the 911 audio recordings or chronology, as well as the alleged inconsistency between the chronology and Mr. Young's testimony. We conclude that the Petitioner has raised and preserved the following grounds for relief: (1) that trial counsel was deficient in investigating the case, in particular the 911 calls; (2) that trial counsel was deficient in failing to impeach Mr. Young with the 911 chronology; (3) that trial counsel was deficient in failing to object to prosecutorial misconduct, particularly the presentation of Mr. Young's testimony about calling 911 and evidence surrounding the cell phone; (4) that trial counsel was deficient in failing to object to the crime scene photographs or cell phone based on the alleged absence of a photograph of the cell phone; and (5) that the State failed in its duty to preserve or produce the cell phone being used by the victim. We conclude that the Petitioner's remaining grounds are either duplicative of these allegations or waived for failure to include them in a written petition and litigate them at the post-conviction hearings.

## II. Ineffective Assistance of Counsel

The Petitioner contends that trial counsel provided ineffective assistance in her representation related to the 911 chronology and the cell phone. The Petitioner's theory of post-conviction relief hinges on his reading of the chronology, which he asserts demonstrates that Mr. Young did not call 911, that multiple calls were made to 911 from Mr. Young's landline telephone, and that one of the 911 callers was the victim. The Petitioner draws the conclusion that trial counsel and the prosecution allowed the jury to decide the case based on perjured testimony and forged evidence. We conclude that the Petitioner has not demonstrated deficiency or prejudice with respect to his claims of ineffective assistance of counsel.

Under the Post-Conviction Procedure Act, a petitioner is entitled to relief when "the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witnesses, the weight and value of witness testimony, and the resolution of factual issues. *Id.* Questions of law and mixed questions of law and fact are reviewed

de novo. *Id.* Each element of a claim of ineffective assistance of counsel is a mixed question of law and fact. *Id.*

Under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, the accused is guaranteed the right to effective assistance of counsel. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). To prevail on a claim that he was denied his constitutional right to effective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance caused prejudice to the defense. *Kendrick*, 454 S.W.3d at 457 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Deficiency requires showing that counsel's errors were so serious "'that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014) (quoting *Strickland*, 466 U.S. at 687). To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). In evaluating counsel's performance, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with the presumption "that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland*, 466 U.S. at 694). The petitioner must show that the deficiency deprived him of a fair trial and called the reliability of the outcome of the proceeding into question. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). A claim may be denied for failure to establish either deficiency

or prejudice, and the reviewing court need not address both components if a petitioner has failed to establish one. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## A. Failure to Investigate

The Petitioner claims that trial counsel was deficient in failing to investigate the 911 chronology and cell phone, which he claims would together have established that the prosecution's witnesses were not being truthful. The post-conviction court found that trial counsel obtained the 911 chronology through an investigator and provided it to the Petitioner prior to trial. The post-conviction court also found that trial counsel testified that she was aware of the identity of the 911 callers and that there was never an allegation that the victim placed a 911 call. Trial counsel did not believe the chronology was helpful to the defense. Trial counsel recalled that the evidence showed that a cell phone was shot from the victim's hand, but she testified that there was never an allegation that the victim was calling 911 when he was shot. At trial, the State presented Officer Smith's testimony identifying the cell phone with a bullet hole that she collected from the scene of the crime, Mr. Young's testimony that he observed his cell phone with a hole in it, and Mr. Moore's testimony that he saw the Petitioner shoot the cell phone out of the victim's hand. Trial counsel stated that she investigated the cell phone but that she did not object to the introduction of the cell phone because there was no basis to object to it.

The post-conviction court found that trial counsel was not deficient in investigating the case, and we concur. Trial counsel hired an investigator who located the 911 chronology which the Petitioner believes contradicts witness testimony. She discussed the chronology with the Petitioner prior to trial but chose not to use it at trial because she did not believe it was helpful to the defense. The cell phone was made an exhibit at trial and was in a condition consistent with that described by three witnesses. The Petitioner has not introduced any evidence during the post-conviction proceedings which he can claim trial counsel should have discovered but did not. On the contrary, trial counsel investigated the case and had the relevant evidence, consisting of the chronology and the cell phone, available at trial, but she made a strategic decision not to introduce the chronology or challenge the cell phone. We conclude the Petitioner has not demonstrated deficiency or prejudice in trial counsel's investigation.

## B. Failure to Impeach Mr. Young with the 911 Chronology

The Petitioner next asserts that trial counsel provided ineffective assistance when she did not impeach Mr. Young with the 911 chronology. The post-conviction court found that trial counsel was aware of the chronology but did not believe it was helpful and accordingly did not use it at trial.

- 11 -

The Petitioner's assertions hinge on his reading of the 911 chronology as establishing that Mr. Young did not call 911 and that the victim did call 911 from Mr. Young's landline. However, the post-conviction proof does not support this conclusion. The post-conviction court's findings of fact included a recitation that Mr. Young gave his cell phone to the victim, who never came in the house but made a call from the porch. Ms. Mondie and Mr. Young both testified that Mr. Young used the landline to call 911. The printed record shows a call from Ms. Mondie's landline, which the same operator later "updated," while another operator "cross-referenced" another "event" reported from a different phone number to the crime. General Carriker testified that the second call came from a different number. General Carriker and trial counsel agreed that there was never any indication the victim called 911. While Ms. Murray agreed with the Petitioner's suggestion that "VM[2] ON CB" might indicate "victim on callback," the post-conviction court found that Ms. Murray could not testify to anything "[o]ther than the data that was printed on the record."

We conclude that trial counsel was not deficient in declining to use the chronology to try to impeach Mr. Young. The evidence at the post-conviction hearing suggested that the chronology listed Ms. Mondie because the telephone line was in her name. The record does not establish that there were two telephone calls from the same number or that one of those calls was placed by the victim. The Petitioner's speculation that the victim, after having been shot five times in the chest with bullets that penetrated his heart, lungs, liver, and pancreas, made his way into Mr. Young's house to use the telephone and then collapsed on the sidewalk outside prior to the arrival of Officer Rouse from a few doors down, is unfounded. Trial counsel was not deficient in determining that the chronology was not beneficial for impeachment because the chronology was consistent with Mr. Young's testimony that he placed a 911 call from Ms. Mondie's landline after the victim was shot. *See Johnson v. State*, 145 S.W.3d 97, 122 (Tenn. Crim. App. 2004) ("[W]e do not discern any clear impeachment value from such a line of questioning because the report was not necessarily inconsistent" with witness testimony). By the same token, the Petitioner cannot demonstrate prejudice. Even if he had been able to show that the victim or Ms. Mondie called 911, this evidence would not have contradicted the testimony of the State's two eyewitnesses that they saw the Petitioner shoot the victim and then run. There is no reasonable probability that the outcome of the proceeding would have been different.

### C. Failure to Object to Prosecutorial Misconduct

The Petitioner, on the same flawed premise that the chronology materially contradicts witness testimony, asserts that trial counsel was deficient in failing to object

---

[2] Ms. Murray was not asked if "VM" might be an abbreviation of voicemail.

to the prosecutor's decision to present the testimony of Mr. Young and Officer Smith and that she was deficient for not objecting to the cell phone's introduction. He asserts that the presentation of the evidence and testimony was misconduct because the chronology contradicts the witness testimony and suggests that the cell phone was fabricated evidence. *See State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993) (the State's knowing use of false testimony is a violation of due process).

As we have noted above, the 911 chronology does not establish that Mr. Young did not call 911, and neither does it establish that the victim did call 911. Instead, it suggests that a 911 call was placed from Ms. Mondie's landline, just as Mr. Young testified. Another 911 call, from an unknown caller, also alerted authorities to the shooting. Accordingly, the chronology does not contradict Mr. Young's testimony, and the Petitioner has not demonstrated that trial counsel should have objected to the prosecutor's choice to present the witness testimony. The evidence also established that Mr. Moore saw the Petitioner shoot the cell phone from the victim's hand, that Mr. Young observed the cell phone with the bullet hole, and that Officer Smith identified the cell phone, which had a bullet hole through the flip-top, as the cell phone she collected from the scene. Accordingly, the prosecutor also did not commit misconduct in introducing the cell phone into evidence. Because there was no basis for trial counsel to object to the prosecutor's conduct, the failure to object was neither deficient nor prejudicial.

### D. Failure to Object to the Crime Scene Photographs or Cell Phone

The Petitioner also asserts that trial counsel was ineffective for not objecting to the admission of the crime scene photographs or cell phone on the basis that the State did not produce a photograph of the cell phone with the hole in it. The Petitioner has not demonstrated that the photographs that were admitted at trial were inadmissible for any reason. Officer Smith testified that the photographs depicted the scene of the crime after the victim was moved, and she indicated the location of the cell phone in the photographs. Any allegation that the scene had been disturbed would go to the weight of the evidence and not its admissibility, and the alleged absence of a photograph of the cell phone would not make other evidence depicting the scene inadmissible. *See State v. Workman*, 667 S.W.2d 44, 47 (Tenn. 1984) (concluding that a witness's inability to link a photograph of spent cartridges to the physical cartridges entered at trial went to the weight and not admissibility of the collective exhibit of photographs when the witness could affirm they were an accurate depiction of the scene). Likewise, the testimony of Mr. Young and Mr. Moore established that the victim was using the cell phone when he was shot. Mr. Moore saw the Petitioner shoot the cell phone out of the victim's hand. Mr. Young and Officer Smith later observed the cell phone with the bullet hole, and a cell phone that Officer Smith identified as the one she collected was introduced into evidence.

The Petitioner has not demonstrated a basis for excluding the cell phone. Accordingly, the Petitioner has failed to show deficiency or prejudice.

### III. Brady and Ferguson Claims

Finally, the Petitioner asserts that the State lost, destroyed, or failed to produce a photograph of the cell phone from the crime scene. The Petitioner's claim is again based on his belief that the victim called 911 from Ms. Mondie's landline. The Petitioner speculates that the victim was calling 911 at the time of the shooting and could not have been talking on the cell phone because he was on the landline. The Petitioner then conjectures that, based on his hypothesis that the victim was using the landline, the cell phone with the bullet in it was fabricated. We note initially that the Petitioner never included any allegations regarding a lost cell phone photograph in his written petitions, and the post-conviction court did not address the issue. The Petitioner did include an allegation that the cell phone introduced at trial had been altered or was fabricated evidence.

The accused in a criminal trial is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution. Part of the right to a fair trial is the "constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999). *Ferguson*, however, concerns evidence which existed at one point and was subsequently lost or destroyed. *See State v. Angela K. Pendergrass*, No. E2013-01409-CCA-R3-CD, 2014 WL 1232204, at *7 (Tenn. Crim. App. Mar. 25, 2014), *perm. app. denied* (Tenn. Aug. 26, 2014) (noting that *Ferguson* "does not require the *creation* of evidence"). Likewise, a claim that the Petitioner's rights were violated by the prosecution's failure to produce evidence requires a showing that the State suppressed evidence which was in the State's possession. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014); *see Brady v. Maryland*, 373 U.S. 83, 87 (1963).

At the post-conviction hearing, the Petitioner presented no evidence that there was a photograph of the cell phone that was either withheld from him or lost or destroyed. The transcripts indicate that he was provided with over one hundred photographs from the State's file. The Petitioner has not demonstrated that the photograph he desires was ever in existence. Neither has he shown that the cell phone used by the victim was altered, destroyed, or fabricated. The proof at trial included the testimony of Mr. Moore, who saw the Petitioner shoot the telephone from the victim's hand before shooting the victim multiple times in the chest and back. Mr. Young's testimony was likewise that the victim was talking on Mr. Young's cell phone when the Petitioner shot him and that Mr. Young subsequently saw that the cell phone had been damaged by a bullet. Ms. Smith

testified that the cell phone had a bullet hole and that she collected the cell phone. The physical evidence of the cell phone with a bullet hole and the autopsy corroborated the witness testimony. The cell phone was authenticated by the State's witnesses, including Ms. Smith, who collected the telephone and was able to identify it based on its packaging and its unique condition. We conclude that the Petitioner has not demonstrated the existence of a photograph, the existence of another telephone, or an alteration in the state of the cell phone introduced at trial, and he is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the post-conviction court's judgment.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE